IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| TRAILBOSS ENTERPRISES, INC., an Alaska Corporation,<br><br>Plaintiff,<br><br>v.<br><br>LAKOTA SOLUTIONS LLC, a Georgia Limited Liability Company,<br><br>Defendant. | *<br>*<br>*<br>*<br>*<br>*  Civil Action Number: _____<br>*<br>*<br>*<br>*<br>*<br>* |

## COMPLAINT AND JURY DEMAND

For its Complaint against the above-named defendant, Plaintiff Trailboss Enterprises, Inc. ("Trailboss"), by and through its undersigned counsel, hereby alleges as follows:

### I.   NATURE OF THE ACTION

1. This is a breach of contract action arising out of the performance of a federal government contract awarded by the United States Department of the Air Force (the "Air Force") to provide aerospace ground equipment ("AGE") maintenance services at Eglin Air Force Base, Florida (the "Eglin AFB Project").

2. This dispute arises out of Defendant Lakota Solution LLC's ("Lakota") bad faith unilateral termination of a subcontract, without notice, executed by Lakota and Trailboss to jointly perform the Eglin AFB Project (the "Subcontract").

3. The Subcontract contemplated a proportionate workshare between Lakota and Trailboss, wherein Lakota would perform approximately 51% of the work required for the Eglin AFB Project and Trailboss would perform the remaining 49% of the work. The Subcontract also

1

provided that Trailboss had the sole and exclusive responsibility to provide all necessary pay and benefits to Trailboss's employees.

4.      For the benefit of Lakota, Trailboss leveraged its extensive history of providing AGE maintenance services to U.S. Government customers to develop a profitable contracting opportunity.  Importantly, Trailboss utilized its business development team to draft a competitive proposal submitted to the Air Force for the Eglin AFB Project, which resulted in award of the prime contract to Lakota (the "Prime Contract").

5.      Following the Air Force's award of the Prime Contract to Lakota, Trailboss also invested significant resources to ensure a smooth startup of the Eglin AFB Project.  Trailboss drafted numerous policies and procedures on Lakota's behalf, which the Prime Contract required Lakota to submit during performance of the project.  Trailboss further led the negotiations of a collective bargaining agreement with the local International Association of Machinists and Aerospace Workers ("IAMAW"), the union that represents the workers on the Eglin AFB Project.

6.      Lakota relied heavily on Trailboss's expertise due to Lakota's overall lack of experience competing for and performing federal government contracts.  Without Trailboss's extensive business development efforts, Lakota would never have been in a position to receive award of the Prime Contract.  In reliance on its belief that Lakota was a good faith partner, Trailboss devoted its internal resources for Lakota's substantial benefit.

7.      In a betrayal of Trailboss's considerable assistance, Lakota terminated the Subcontract on a mere pretense.  Specifically, and notwithstanding the fact the Subcontract provided that employee benefits were the sole responsibility of Trailboss, Lakota asserted in a letter from its legal counsel that Trailboss's alleged failure to make certain 401(k) contribution

payments to its <u>own employees</u> somehow represented a material breach of the Subcontract justifying immediate rescission.

8. Using this pretense, Lakota summarily terminated the Subcontract and instructed Trailboss to cease any and all work relating to the Eglin AFB Project. In violation of applicable law, Lakota failed to provide Trailboss notice and an opportunity to cure the purported breach, as expressly required by the Subcontract.

9. Lakota representatives also approached Trailboss's employees working on the Eglin AFB Project to inform them of the company's decision to terminate the Subcontract. In fact, Lakota's representatives took the extraordinary step of preparing individual resignation letters for each of Trailboss's employees, and demanded that they immediately resign their employment with Trailboss and accept employment with Lakota.

10. Lakota's representatives threatened that if Trailboss's employees did not obey their directive, they would no longer be able to continue working on the Eglin AFB Project. Trailboss only learned of Lakota's actions when it received 18 identical resignation letters from its employees, each of which stated the employee was immediately resigning their employment without notice.

11. Lakota's termination of the Subcontract was a bad faith, premeditated act of opportunism. Rather than share the profits of the Prime Contract that Trailboss helped secure, Lakota instead cooked up a plan to remove Trailboss from the Eglin AFB Project and keep 100% of the profits for itself.

12. This action arises out of Lakota's breach of the Subcontract. Lakota's callous acts caused and continue to cause Trailboss to suffer significant damages. Trailboss now asserts claims

for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and tortious interference.

## II.  PARTIES

13. Plaintiff is Trailboss Enterprises, Inc., a corporation organized under the laws of the state of Alaska, with a principal place of business located in Anchorage, Alaska.

14. Defendant is Lakota Solutions LLC, a limited liability company organized and, upon information and belief, has a principal place of business located in Warner Robbins, Houston County, Georgia.  Upon information and belief, no member of Lakota Solutions LLC is a citizen of Alaska.

## III.  JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this lawsuit in accordance with 28 U.S.C. § 1332.  All parties are diverse in citizenship and the matter in controversy exceeds $75,000, exclusive of interest and costs, as alleged further below.

16. This Court has personal jurisdiction over Defendant Lakota because it is a limited liability company organized under the laws of the state of Georgia.  Defendant Lakota transacts business within this District.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to the Court's personal jurisdiction and because the Subcontract provides that venue for any dispute relating thereto shall lie in Houston County, Georgia.

## IV.  GENERAL ALLEGATIONS

**A.  EGLIN AFB PROJECT PROCUREMENT**

18. On or about October 7, 2017, the Air Force issued Request for Proposal No. FA2486-18-R-0006 (the "Solicitation").  The Solicitation constituted a competitively negotiated

procurement pursuant to the Federal Acquisition Regulation ("FAR") and the Department of Defense FAR Supplement ("DFARS").

19. Codified in Title 48, Chapter 1 of the Code of Federal Regulations, the FAR is a set of regulations and contractual provisions that set forth "uniform policies and procedures for acquisition by all executive agencies."  48 C.F.R. § 1.101.  The DFARS is codified in Title 48, Chapter 2 of the Code of Federal Regulations and is regarded as "[t]he defense acquisition system." 48 C.F.R. § 201.101.  As a military branch of the Department of Defense, the Air Force is an "executive agency" and typically procures goods and services pursuant to both the FAR and DFARS.

20. The Solicitation requested proposals from contractors to provide AGE maintenance services on behalf of the 96th Test Wing located at Eglin AFB, Florida.  Specifically, the Solicitation stated, "[t]he service provider shall provide personnel, equipment, tools, materials, vehicles, supervision, logistics, training, technical support, and other times and services . . . necessary to manage and perform" the AGE maintenance services.

21. The Air Force permitted only small businesses certified under the Small Business Administration's ("SBA") 8(a) Program to submit a proposal as a prime contractor.[1]

22. Through the Solicitation, the Air Force intended to award a contract with a period of performance of over seven years.  Specifically, the Solicitation contemplated a six-month base period, six one-year option periods, and two additional six-month option periods.

---

[1] The SBA 8(a) Program is a developmental program in which the federal government awards a certain amount of contracts to small businesses owned by socially and economically disadvantaged individuals.  *See* 13 C.F.R. § 124.1.

23. On or about October 26, 2017, Trailboss and Lakota executed a teaming agreement, wherein the parties agreed to utilize their respective capabilities to submit a competitive proposal in response to the Solicitation (the "Teaming Agreement"). A true and correct copy of the Teaming Agreement is appended hereto as Exhibit A.

24. The Teaming Agreement contemplated that Lakota would serve as the "prime contractor" *(i.e.*, the entity executing the contract with the Air Force) for the Eglin AFB Project, with Trailboss serving as a subcontractor. The parties selected this arrangement due to Lakota's status as a business certified under the SBA 8(a) Program, despite Trailboss's superior experience performing AGE maintenance service contracts.

25. Trailboss is a service-disabled veteran, minority owned business with over 18 years of experience performing AGE maintenance service contracts on behalf of various U.S. Government agencies. Trailboss also possesses significant experience complying with various federal procurement regulations applicable to performing service contracts on behalf of the U.S. Government, such as the Service Contract Act (41 U.S.C. §§ 6701 *et seq.*), the FAR, and the DFARS.

26. Upon information and belief, prior to the Eglin AFB Project, Lakota never performed a contract on behalf of the U.S. Government requiring AGE maintenance services, nor did Lakota possess experience complying with the provisions of the Service Contract Act, the FAR, or the DFARS.

27. Recognizing Trailboss's vast experience, the Teaming Agreement specifically designated Trailboss as the party responsible for developing the technical capability and price volumes of the proposal submitted to the Air Force by the parties.

28. Section 2 of the Teaming Agreement specifically stated: "As the subcontractor, Trailboss shall have overall responsibility for the preparation and submission of the Proposal."

29. Section 3 of the Teaming Agreement separately stated: "The final proposal shall be timely prepared at the Trailboss facility."

30. In the federal government contracts industry, it is typical for the prime contractor to perform the majority of the proposal development and submission tasks—not the subcontractor.

31. In exchange for its extensive efforts in preparing the proposal, the Teaming Agreement set forth a generous workshare agreement between Trailboss and Lakota relating to the Eglin AFB Project.

32. Exhibit A to the Teaming Agreement specifically stated: "The estimated workshare shall be: [Lakota] 51% and Trailboss 49%. Specific workshare will be finalized during proposal preparation and pricing buildup." This is because Section 3 of the Teaming Agreement stated: "Proposal and marketing costs incurred by either party will be the sole and separate responsibility of each party."

33. Lakota never compensated Trailboss for its extensive bid and proposal costs incurred to develop and submit a proposal to the Air Force in response to the Solicitation.

34. Trailboss contributed its substantial efforts in reliance on its good faith belief that it would receive the benefits of the Subcontract and that Lakota would be a good faith partner under its Prime Contract.

35. On or about November 29, 2017, Lakota submitted to the Air Force the proposal prepared by Trailboss on behalf of both parties.

36. The Air Force awarded Contract No. FA2486-18-C-0006 to Lakota on or about June 21, 2018, defined above as the "Prime Contract." The total value of the Prime Contract was

approximately $30.9 million. A true and correct copy of the Prime Contract is appended hereto as Exhibit B.

37. Following the resolution of two separate bid protests submitted by a disappointed bidder, the Air Force issued a Notice to Proceed under the Contract on January 1, 2019, authorizing Lakota and Trailboss to begin performance on the Eglin AFB Project.

**B.   THE LAKOTA/TRAILBOSS SUBCONTRACT**

38. On January 1, 2019, Trailboss and Lakota executed Subcontract No. LSC-19-001, defined above as the "Subcontract." A true and correct copy of the Subcontract is appended hereto as Exhibit C.

39. Like all contracts subject to Georgia law, the Subcontract carried with it an implied covenant of good faith and fair dealing.

40. This covenant and other obligations required Lakota to treat Trailboss in a cooperative manner and prohibited Lakota from taking opportunistic advantages to the detriment of Trailboss.

41. Section 5 set forth the term of the Subcontract, which consisted of an initial base period of performance from January 1, 2019 through September 30, 2019, and seven additional one-year option periods that extended the term to September 30, 2025. The term of the Subcontract corresponded to the period of performance set forth in the Prime Contract.

42. The Subcontract stated that the option periods would be exercised "[i]f the government exercises its right to extend the prime contract." Upon information and belief, the Air Force routinely exercises the option periods for the Eglin AFB Project.

43. With respect to the Eglin AFB Project, the Subcontract required Trailboss to "provide dispatching, servicing, inspecting, cleaning, corrosion control, modification and

maintenance of powered/non-powered Aerospace Ground Equipment, munitions material handling trailers/components, and equipment other than AGE as determined by [the Air Force]."

44. The total value of the Subcontract to be received by Trailboss, including all option periods, equaled approximately $13 million.

45. Under the terms of the Subcontract, "[t]he Subcontractor shall be paid for each compensated hour in direct support of the work required in Appendix A - Statement of Work, for each labor category in accordance with the classification rates included in B.2." Appendix B to the Subcontract required Lakota to compensate Trailboss for each hour of labor performed based upon the fully burdened labor rates for each labor category set forth therein.

46. The total labor to be performed by Trailboss roughly equaled the 51% - 49% workshare agreement expressed in the Teaming Agreement.

47. As to Trailboss and Lakota, the Subcontract stated that the parties operated as independent contractors. Specifically, Section 10 and Appendix A1.3 of the Subcontract each required Trailboss to assume the exclusive responsibility for its own employees. This included assuming responsibility for "all normal employer-employee matters such as recruitment, retention, insurance, pay, benefits, discipline, severance, and termination of employment."

48. Appendix D of the Subcontract expressly incorporated by reference various FAR and DFARS contractual provisions set forth in the Prime Contract, commonly referred to in the federal government contracts industry as "flowdowns." Section 28.7 of the Subcontract provided that, in the event of any conflict or ambiguity contained in the terms of the Subcontract, "the terms of the Prime Contract shall control."

49. One clause incorporated in Appendix D of the Subcontract is FAR 52.249-8 (*i.e.*, 48 C.F.R. § 52.249-8), entitled "Default (Fixed-Price Supply and Service)." With exceptions

not relevant here, that provision permitted Lakota to terminate the agreement for a failure by Trailboss to comply with the Subcontract, but <u>only if</u> Trailboss "[did] not cure such failure within 10 days (or more if authorized in writing by [Lakota]) after receipt of the notice from [Lakota] specifying the failure."

50.     Although FAR and DFARS terms typically govern the prime contract executed with the U.S. Government, the Subcontract instructed that the terms used in the FAR and DFARS provisions should be substituted "[w]henever necessary to make the context of those clauses . . . applicable to this Subcontract."

**C.     TRAILBOSS'S PERFORMANCE UNDER THE SUBCONTRACT**

51.     Following the Air Force's award of the Prime Contract, Trailboss continued its significant investment of internal resources on Lakota's behalf to ensure a successful startup to the Eglin AFB Project.

52.     On March 15, 2019, Trailboss prepared and delivered to Lakota several necessary policies and procedures, such as the Eglin AGdE Training Plan, the Eglin Safety and Health Plan, and the Eglin Quality Control Plan. The Prime Contract required Lakota to submit these policies and procedures following the commencement of performance.

53.     Upon information and belief, Lakota submitted the policies and procedures to the Air Force in satisfaction of the Prime Contract's requirements. In the federal government contracts industry, it is typical for the prime contractor to develop the policies and procedures relating to a specific project—not the subcontractor.

54.     Lakota never compensated Trailboss for its assistance in creating the policies and procedures referenced above.

55. Nonetheless, Trailboss provided this additional support in further reliance on Lakota's assurances that it was a good faith partner in the Subcontract.

56. On May 5-7, 2019, Trailboss participated in extensive negotiations of a collective bargaining agreement ("CBA") with the IAMAW. For Lakota's benefit, Trailboss led the negotiations, which culminated in a new CBA intended to be incorporated into the Prime Contract.

57. On June 7, 2019, Trailboss delivered the CBA executed by the IAMAW to Lakota, and requested that Lakota countersign the CBA as the prime contractor. Lakota returned a fully executed version of the CBA to the IAMAW on June 20, 2019.

58. Throughout performance of the Eglin AFB Project, Trailboss remained the main point of contact for communications with the IAMAW.

59. This was unusual because, in the federal government contracts industry, it is typical for the prime contractor to be the focal point of communications with the labor unions—not the subcontractor.

60. Because Trailboss viewed Lakota as a good faith partner in the Subcontract, Trailboss never sought compensation from Lakota for the efforts to negotiate the CBA, or for regularly interfacing with the IAMAW.

**D.  LAKOTA'S TERMINATION OF THE SUBCONTRACT**

61. On March 11, 2020, Lakota's legal counsel, H. J. Strickland, Jr. transmitted a letter to Trailboss "immediately terminating" the Subcontract (the "Termination Letter"). The Termination Letter is appended hereto as <u>Exhibit D</u>.

62. The Termination Letter contended that Trailboss breached Section 22 of the Subcontract, which states: "Subcontractor shall observe and abide by all applicable federal, state

11

and local laws, and the rules and regulations of any lawful regulatory body acting there under [sic] in connection with the Services to be rendered pursuant to this Subcontract."

63. Relying on the above-referenced provision, the Termination Letter levied allegations that Trailboss "repeatedly failed to properly fund Trailboss employees' 401(k) plans," asserting that Trailboss violated applicable federal laws.

64. The Termination Letter claimed that Trailboss's alleged failure to properly fund its employees' 401(k) plans represented a "material breach of the Subcontract."

65. Importantly, prior to the Termination Letter, Lakota neither notified Trailboss that it considered its conduct to violate the terms of the Subcontract, nor provided Trailboss an opportunity to cure such a violation.

66. In conclusion, the Termination Letter alluded to the possibility that the Air Force may prefer that certain Trailboss employees continue performing work on the Eglin AFB Project, notwithstanding Lakota's termination decision. Specifically, Lakota stated: "[Lakota] assumes that Trailboss will carefully review its legal obligations and rights in connection with any such transition."

67. Unbeknownst to Trailboss, Lakota had already taken steps to induce Trailboss's employees on the Eglin AFB Project to resign their employment with Trailboss without its knowledge or consent.

68. On the morning of March 13, 2020, Lakota representatives gathered Trailboss's employees at the Eglin AFB Project to inform them of Lakota's decision to terminate the Subcontract. At that time, Lakota demanded each of Trailboss's employees sign resignation letters, which uniformly stated:

**IMMEDIATE LETTER OF RESIGNATION**

Please accept this letter as my formal resignation from Trailboss Inc . . . effective immediately.

I sincerely apologize for the abrupt timing of this announcement, however due to unforeseen circumstances, I have decided to resign.

Please let me know how I can be of assistance during the transition period.

69. Upon information and belief, Lakota representatives prepared the resignation letters on behalf of Trailboss's employees in advance of the March 13, 2020 meeting.

70. During the March 13, 2020 meeting, Lakota's representatives coerced Trailboss's employees to resign their employment and accept employment with Lakota by threating that, if they did not do so, the employees would no longer be able to continue working on the Eglin AFB Project.

71. In total, Trailboss received 18 identical resignation letters representing each of its employees working on the Eglin AFB Project.

72. Upon information and belief, each of the 18 former Trailboss employees accepted employment from Lakota to continue working on the Eglin AFB Project.

**E.     DAMAGES**

73. As a result of Lakota's pernicious plan to eject Trailboss from a profitable contract, Trailboss has suffered direct damages resulting from Lakota's breach of the Subcontract, as well as loss of substantial revenue and profits from the Eglin AFB Project.

74. Upon information and belief, Trailboss's damages exceed $900,000. The precise amount of damages will be proven at trial.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Breach of Contract)

75. Trailboss repeats and realleges the allegations contained in the preceding paragraphs.

76. Trailboss and Lakota entered into a valid, enforceable contract to perform AGE maintenance services at Eglin AFB—the Subcontract.

77. The Subcontract expressly required Lakota to provide Trailboss notice of any alleged violation of the Subcontract, and, apart from exceptions not relevant here, an opportunity to cure such violation, prior to terminating the agreement.

78. Lakota unilaterally terminated the Subcontract without providing Trailboss such notice and opportunity to cure, alleging that Trailboss materially breached the Subcontract.

79. At no point did Trailboss commit a material breach of the Subcontract.

80. By failing to comply with the Subcontract's requirements to provide notice and an opportunity to cure, Lakota breached the Subcontract when it terminated the agreement.

81. As a direct and proximate result of Lakota's breach of the Subcontract, Trailboss was damaged in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
(Breach of the Covenant of Good Faith and Fair Dealing)

82. Trailboss repeats and realleges the allegations contained in the preceding paragraphs.

83. As a contract subject to Georgia law, the Subcontract included an implied covenant of good faith and fair dealing.

84. Under the implied covenant of good faith and fair dealing, Lakota was prohibited from committing an act that would injure the rights of Trailboss to receive the benefits of the Subcontract.

85. The Subcontract incorporated FAR 52.249-8, which expressly required Lakota to undertake two steps prior to terminating the Subcontract: (i) provide written notice to Trailboss identifying the alleged breach of the Subcontract; and (ii) permit Trailboss a minimum of ten days to cure the purported breach of the Subcontract.

86. Lakota violated the implied covenant of good faith and fair dealing through its failure to provide Trailboss notice and an opportunity to cure the alleged breach cited in the Termination Letter.

87. Lakota interfered with Trailboss's reasonable expectation to receive the benefits of the Subcontract. Lakota knew, or had reason to know, that its interference and failure to comply with the Subcontract's notice and cure requirement was unreasonable.

88. Lakota's actions were contrary to the common purpose and justified expectations established by the Subcontract.

89. As a direct and proximate result of Lakota's breach of the implied covenant of good faith and fair dealing, Trailboss has been damaged in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**(Unjust Enrichment)**

90. Trailboss repeats and realleges the allegations contained in the preceding paragraphs.

91. As explained above, Trailboss rendered significant services to Lakota with regard to the Eglin AFB Contract, which Lakota subsequently accepted.

92. Lakota received numerous benefits from Trailboss's services, including winning the Prime Contract. This resulted in Lakota receiving substantial revenue and increased profits.

93. Lakota received these and other benefits at Trailboss's expense.

94. Lakota never compensated Trailboss for the services provided in furtherance of the Eglin AFB Project.

95. The circumstances under which Lakota received these benefits would make it unjust for it to retain the same without compensating Trailboss.

96. Lakota has been unjustly enriched by its wrongful actions in the manner described above, which damaged Trailboss in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
**(Tortious Interference of Contract)**

97. Trailboss repeats and realleges the allegations contained in the preceding paragraphs.

98. As detailed above, Trailboss and Lakota entered into a valid, enforceable contract to perform AGE maintenance services at Eglin AFB.

99. The Subcontract contemplated that Lakota and Trailboss would proceed with a workshare agreement of approximately 51% to Lakota and 49% to Trailboss.

100. As a result, Trailboss utilized its own employees to perform work under the Subcontract for the Eglin AFB Project.

101. Trailboss had valid and enforceable contracts with its employees working on the Eglin AFB Project.

102. Around the time Lakota improperly terminated the Subcontract, Lakota intentionally interfered with Trailboss's employment agreements with its employees. Lakota's interference was done for both an improper purpose and by improper means.

103. If not for Lakota's tortious interference, Trailboss would have utilized its employees to perform other work and derive substantial revenue and profits.

104. As a result of Lakota's tortious interference, Trailboss suffered damages in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
(O.C.G.A. § 13-6-11 Attorneys' Fees)

105. Trailboss repeats and realleges the allegations contained in the preceding paragraphs.

106. Lakota has acted in bad faith and has caused Trailboss unnecessary trouble and expense.

107. Trailboss is entitled to recover from Lakota Trailboss's expenses of litigation, including reasonable attorneys' fees, under O.C.G.A. § 13-6-11, in an amount to be proven at trial.

### VI.  REQUESTED RELIEF

Based on the above, Trailboss respectfully requests that this Court grant the following relief:

a) Award Trailboss its actual, consequential, and/or compensatory damages to be paid by Lakota in amounts to be proven at trial;

b) Award Trailboss applicable pre-judgment and post-judgment interest;

c) Award Trailboss its attorney fees and costs incurred for bringing and prosecuting this action, including attorney fees and costs under to O.C.G.A. § 13-6-11; and

d) Award Trailboss such additional relief as this Court deems just and proper under the circumstances.

## VII.    <u>JURY DEMAND</u>

Trailboss hereby demands a trial by jury on any and all issues so triable.

Dated: April 5, 2021             Respectfully submitted,

                                             */s/ **T. Joshua R. Archer***
                                             T. Joshua R. Archer
                                             Georgia Bar No. 021208
                                             BALCH & BINGHAM LLP
                                             30 Ivan Allen Jr. Boulevard N.W., Suite 700
                                             Atlanta, Georgia 30308
                                             Telephone: 404-261-6020
                                             Facsimile: 866-332-8986
                                             jarcher@balch.com

                                             Shaun C. Kennedy (*pro hac vice* pending)
                                             Michael J. Carrigan (*pro hac vice* pending)
                                             HOLLAND & HART LLP
                                             555 17th Street, Suite 3200
                                             Denver, Colorado 80201
                                             Telephone: 303-295-8000
                                             Facsimile: 303-957-5460
                                             sckennedy@hollandhart.com
                                             mjcarrigan@hollandhart.com

                                             **ATTORNEYS FOR PLAINTIFF,**
                                             **TRAILBOSS ENTERPRISES, INC.**